UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

| | | |
|---|---|---|
| ASHLEY STARKEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:10CV69 TIA |
| | ) | |
| MICHAEL ASTRUE, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**
**OF UNITED STATES MAGISTRATE JUDGE**

This cause is on appeal from an adverse ruling of the Social Security Administration.

The suit involves an application for Supplemental Security Income under Title XVI of the Act.

Claimant has filed a Brief in Support of his Complaint; the Commissioner has filed a Brief in

Support of his Answer. The parties consented to the jurisdiction of the undersigned pursuant to

28 U.S.C. § 636(c).

**I.     Procedural History**

On October 23, 2007, Claimant filed an Application for Supplemental Security Income

payments pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, et. seq. (Tr. 104-

12)[1] alleging disability since October 1, 2007 due to ethromyalogia.  (Tr. 131).  The application

was denied (Tr. 61-65), and Claimant subsequently requested a hearing before an Administrative

Law Judge ("ALJ"). (Tr. 66).  On November 16, 2009, a hearing was held before an ALJ.  (Tr.

30-56).  Claimant testified and was represented by counsel.  (Id. at 30-53).  Vocational Expert

---

[1]"Tr." refers to the page of the administrative record filed by Defendant with its Answer.
(Docket No. 11/filed January 12, 2011).

Thomas Dunleavy also testified at the hearing. (Tr. 53-55, 98). In a decision dated January 29, 2010, the ALJ found that Claimant had not been under a disability as defined by the Social Security Act. (Tr. 8-26). After considering counsel's letter in support, the Appeals Council denied Claimant's Request for Review on September 9, 2010. (Tr. 1-5, 165-66). Thus, the ALJ's decision is the final decision of the Commissioner.

## II. Evidence Before the ALJ

### A. Hearing on November 16, 2009

#### 1. Claimant's Testimony

At the hearing on November 16, 2009, Claimant testified in response to questions posed by the ALJ and counsel. (Tr. 34-53). Claimant testified that she is nineteen years old and lives in a house with her parents and her aunt. (Tr. 34). Claimant completed the tenth grade being home schooled. (Tr. 35). Claimant stands at five feet one inches and weighs 160 pounds. (Tr. 34). Claimant has a driving permit. (Tr. 35). Claimant is right-handed. Claimant has worked in a volunteer capacity. (Tr. 35). Because of her medical conditions, Claimant left regular school after sixth grade, and she was home schooled. (Tr. 47).

Claimant testified that her doctor has diagnosed her with small fiber neuropathy. (Tr. 36). Claimant's conditions affect her basic work functions including sitting for short periods of time and difficulty lifting and carrying. (Tr. 36). On average two days a week, the pain prevents Claimant from getting out of bed all day. (Tr. 37).

Dr. Anne Connolly, a neurologist, and Dr. Jan Onik treat Claimant. (Tr. 37). Dr. Connolly has been treating Claimant for five years. (Tr. 37). Dr. Connolly measures her loss of muscle mass, monitors her nerve functions, and checks the dosages of her medications. (Tr. 37-

38). Claimant testified she is looking for a physician she can afford to conduct genetic testing. (Tr. 38). Dr. Connolly prescribes Neurontin as treatment. Dr. Onik is Claimant's treating doctor since birth. Claimant sees Dr. Onik once a month, and he prescribes Antivert for her vertigo. (Tr. 38). Claimant testified that the Antivert helps treat her vertigo, and the Neurontin is tolerable. (Tr. 39). Both medications help Claimant to some degree. Low energy and drowsiness are the side effects of the medications. (Tr. 39). Claimant testified that the doctors advise her to do physical activities as tolerated and to be careful. (Tr. 40). Claimant's pain cycle increases at night and prevents her from sleeping at night. Claimant tries to sleep a couple of hours during the day. (Tr. 40). Claimant testified that she does not have any psychological conditions impacting her ability to work. (Tr. 46).

Claimant experiences constant pain over her entire body. (Tr. 46). The pain increases and burns at times. If someone bumps into her, Claimant feels like she has been hit with a bat. (Tr. 46). Physical activity causes Claimant's pain to become worse. (Tr. 47). Claimant cannot take pain medications. Doing the breathing techniques provided by her doctors helps reduce the pain at times. (Tr. 47).

As to her daily activities, Claimant wakes up between 9:00 and 11:00 in the morning. (Tr. 41). Depending upon how she feels, Claimant tries to move around, sleep for a couple of hours, and watches television. Claimant cuts some fruit and eats the fruit. (Tr. 41). On a good day, Claimant works on the computer and watches television. (Tr. 42). On a bad day, Claimant lies down and does not do much. Twice a week, Claimant cannot get out of bed. (Tr. 42). Claimant avoids going outside unless she is going to the store. (Tr. 43). Claimant sometimes helps her mother and her sick aunt by giving her a glass of water or giving her a blanket. Claimant can

dress on her own. (Tr. 43). Claimant cannot brush her hair, because she cannot lift her arms to chest level. (Tr. 44). On a good day, Claimant can brush her teeth. Claimant testified that she cannot open jars or hold onto anything. Claimant does some of her laundry, wipes off the counter, folds some blankets, and fixes the pillows on the couch. (Tr. 44). Washing dishes is too strenuous on Claimant's back and hurts her legs. (Tr. 45). Claimant enjoys watching bull riding and rodeos. For exercise, Claimant walks around the house as suggested by her doctor. (Tr. 45). Claimant testified that can lift about four pounds and can walk for two to four minutes. (Tr. 47-48). After walking for two to four minutes, Claimant has to rest for fifteen to twenty-five minutes. (Tr. 48). Claimant testified that she can stand for fifteen minutes and sit for thirty minutes in an eight-hour day. (Tr. 49). Claimant has difficulty lifting her arms to hold onto the steering wheel. (Tr. 50).

Claimant worked at a residential home serving food, dispatching the laundry, cleaning the tables, and wiping off trays, but Claimant had to sit down often. (Tr. 51). Claimant worked one day and then she was out for two to three days. (Tr. 52). Friends owned the residential home. (Tr. 53).

### 2. Testimony of Vocational Expert

Vocational Expert Thomas Dunleavy, a vocational consultant, testified in response to the ALJ's questions. (Tr. 53-55). Mr. Dunleavy testified that he was familiar with the jobs existing in the state of Missouri. (Tr. 53). Mr. Dunleavy indicated that Claimant has no past relevant work. (Tr. 54). The ALJ asked Mr. Dunleavy if he found Claimant to be credible, could she work. After responding no, Mr. Dunleavy explained how Claimant's being confined to the home a couple of days each week would preclude Claimant from working. (Tr. 54).

## III.    Medical and Other Records

In the Outpatient Clinic note of January 5, 2007, Claimant reported continued generalized pain in a follow-up visit with Dr. Nabi Ahmad. (Tr. 169). Claimant has pain in her back, her upper, middle and lower areas. Claimant's activities are limited due to her pain. Dr. Ahmad noted that with physical therapy, Claimant made some progress but when the therapy intensified, her pain increased. Dr. Ahmad noted his difficulty in determining the cause of Claimant's pain. Dr. Ahmad diagnosed Claimant with hyperesthesia based on his examination, very poor pain tolerance, and chronic pain syndrome. Dr. Ahmad recommended a neurological evaluation be completed. Dr. Ahmad noted that Claimant takes Neurontin and Zantac. Dr. Ahmad noted that Claimant's functional limitations prevent her from participating in physical activities and walking, and she has gained weight due to the lack of mobility. (Tr. 169).

On March 21, 2007, Dr. Anne Connolly, an associate professor at Washington University and a pediatric neurologist, completed a neurologic examination of Claimant. (Tr. 182-83). Dr. Connolly noted that Claimant had no weakness on repetitive sitting and rising. (Tr. 182). On sensory testing, Claimant reported diffuse hyperesthesia and a patchy altered sensation to temperature. Dr. Connolly observed Claimant's gait to be normal and able to walk on her heels and her toes. Dr. Connolly noted Claimant to have quite a bit of give away weakness but with encouragement, Claimant was able to give good effort with no weakness on repetitive sitting/rising. Dr. Connolly noted that the 2005 EMG/nerve conduction studies showed a partial neuropathy of the common peroneal nerve on the right and a mild tibial neuropathy. Dr. Connolly opined that Claimant has chronic severe hyperesthesia and allodynia, and there are various possibilities for what may be causing her condition. Her diagnosis included erythromelalgia and

autoimmune small fiber neuropathy. (Tr. 182). The quantitative sensory testing was consistent with a small fiber neuropathy. (Tr. 183). Dr. Connolly recommended Claimant continue with her plans to engage in Biofeedback inasmuch as it may be an effective treatment modality. (Tr. 182). Dr. Connolly noted that she would follow up with Claimant on an as-needed basis depending upon the results of her testing. (Tr. 182).

In the Childhood Disability Evaluation Form dated January 11, 2008, Dr. William Busby listed erythromelalgia as Claimant's impairment. (Tr. 184). With respect to functional equivalence, Dr. Busby found Claimant to be less than marked in interacting and relating with others and caring for herself. (Tr. 186). Dr. Busby noted that Claimant's mother reported that she brushes Claimant's hair and assists with taking showers. (Tr. 186). Dr. Busby found that Claimant does not have an impairment or combination of impairments functionally equal to the listing. (Tr. 188).

The March 18, 2008 MRI of Claimant's brain and spine showed low-lying cerebellar tonsils but otherwise normal study of the brain and spine. (Tr. 200).

On May 15, 2008, Claimant returned for follow-up treatment for her chronic pain. (Tr. 194). Claimant reported progressive pain in her extremities and episodic sharp pains in her torso bilaterally. During the daily episode, Claimant is unable to move the affected extremity. (Tr. 194). Dr. Connolly noted that Claimant's MRI of her brain and spine showed Chiari 1 malformation and the remainder of the studies to be unremarkable. (Tr. 195). Claimant's primary care physician prescribes Neurontin and Antivert. Claimant reported preparing to finish twelfth grade and planning to continue her studies from home to become a medical assistant. Sensory examination showed Claimant to have patchy sensory abnormalities to light touch, pain, and

temperature.  Dr. Connolly noted that Claimant to be able to perform test of coordination including finger-nose-finger and heel-knee-shin testing without difficulty.  Dr. Connolly observed Claimant to have an antalgic gait and able to take a limited number of steps on her heels and toes limited secondary to pain.  (Tr. 195).  Claimant had diffuse pain to palpation of the extremities.  (Tr. 196).  Dr. Connolly opined that the etiology of Claimant's symptoms remains unknown.  Dr. Connolly instructed Claimant to take Aleve one tablet orally twice a day to better control her symptoms.  (Tr. 196).

On July 3, 2008, Dr. Jan Onik diagnosed Claimant with RSD nerve disorder.  (Tr. 190).  Examination showed edema to Claimant's right leg and prescribed Neurontin as treatment.  (Tr. 190).  On July 25, 2008, Dr. Onik removed the sutures from Claimant's right leg.  (Tr. 192).

On September 19, 2008, Claimant reported knee pain.   (Tr. 205).  Claimant reported graduating from high school and wanting to be a barrel rider.  (Tr. 205).  Dr. Heidi Prather observed Claimant to have difficulty going from the table to standing erect and shifting her weight from side to side.  (Tr. 206).  Examination showed pain over the medial jointline and pain with forced knee flexion.  (Tr. 206).  The MRI showed partial discoid lateral meniscus in Claimant's right knee.  (Tr. 207).  Dr. Prather noted that Claimant is not a surgical candidate and recommended plan of treatment by Dr. Brophy.  (Tr. 207).  The x-ray of Claimant's lumbar spine and right knee showed a normal examination of the lumbar spine and disuse osteoporosis of her right knee.  (Tr. 216, 218).

The MRI of Claimant's lumbar spine taken on September 26, 2008 showed normal anatomic alignment, mild L4-L5 and minimal L5-S1 disc disease, mild bilateral L4-L5 facet arthropathy, and otherwise normal lumbar spine.  (Tr. 220-21).  The MRI of Claimant's right

knee showed partial discoid meniscus in the right knee without tear and normal ligaments and articular surfaces. (Tr. 222-23).

On October 16, 2008, Dr. Robert Brophy evaluated Claimant's right knee pain. (Tr. 209). Claimant reported knee symptoms started in 2005 when a chair collapsed while she was sitting in it. Claimant developed reflex sympathetic dystrophy with significant motor and sensory symptoms and underwent multiple nerve release in September 2005. Since her initial injury, Claimant reported having episodes of giving way in her knee and weakness with activities. Examination of bilateral knees showed full range of motion from 0 to 130 degrees bilaterally. (Tr. 209). Dr. Brophy opined that Claimant's episodes of knee pain do not appear to be caused by any structural abnormality. (Tr. 210). Dr. Brophy indicated that Claimant could continue activities on an as-tolerated basis and should continue to work on strengthening of her knee musculature. Dr. Brophy noted that Claimant's difficulties were most likely consistent with patellofemoral origin and recommended conservative treatment. (Tr. 210). The x-ray of Claimant's right knee showed disuse osteoporosis which may be due to long-standing nuerogenic disease. (Tr. 224).

In a letter addressed "To whom it may concern:" written by Dr. Onik, on June 1, 2009, the letter states:

> Ms. Starkey is a 19-year-old female who's been seen by me for complaints of generalized motor and neurological pain. She's been seen in consultation at the Washington University School of Medicine in St. Louis Missouri and she's been seen by A.M. Connolly, M.D. At this point, the medical reasoning for her complaints of joint and muscle pain is small fiber neuropathy. Due to the extraordinary symptomatic pain that she demonstrates, it is my feeling that she is eligible for disability until this has been disproved. She will continue to follow up with Dr. Connolly. Hopefully resolution other than disabling pain will be found.
> (Tr. 225).[2]

_____

[2]A physician's opinion that a claimant is "disabled" or "unable to work" does not carry "any special significance," 20 C.F.R. § 416.927(e)(1), (3), because it invades the province of the

On June 8, 2009, Dr. Onik diagnosed Claimant with peripheral neuropathy and recommended follow-up treatment with Dr. Connolly. (Tr. 226). The laboratory test results for lupus were negative. (Tr. 227). In a follow-up visit on July 15, 2009, Dr. Onik treated her peripheral neuropathy. (Tr. 228-29).

## IV.    The ALJ's Decision

The ALJ noted that Claimant was born on September 7, 1990 and was therefore in the "Adolescents (age 12 to attainment of age 18)" age group on October 9, 2007, the date the application was filed. (Tr. 15). Claimant attained the age of 18 on September 6, 2008. The ALJ determined that Claimant has not engaged in substantial gainful activity since the date she filed the application. (Tr. 15). Before attaining the age of 18, the ALJ found that Claimant had the following severe impairments: small fiber neuropathy, hyperthesia, chronic pain syndrome, and possible erythromelalgia. (Tr. 16). Before attaining the age of 18, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. 404, Subpart P, Appendix 1, Part A or B or functionally equaled the listings, 20 C.F.R. 416.924(d) and 416.926a. (Tr. 16). The ALJ opined that inasmuch as Claimant did not have an impairment or combination of impairments the met, medically equaled any listing or functionally equaled the listings, Claimant was not disabled prior to attaining age 18. (Tr. 24). Since attaining the age 18, Claimant has not developed any new impairment or impairments and has continued to have a severe impairment or combination of impairments. Claimant has not had an impairment or combination of impairments that meets or medically equals a listed impairment. (Tr. 24). After careful consideration of the entire record,

Commissioner to make the ultimate determination of disability. House v. Astrue, 500 F.3d 741, 745 (8th Cir. 2007).

the ALJ opined that since attaining the age 18, Claimant has had the residual functional capacity to perform the full range of light work as defined in 20 C.F.R. 416.967(b). (Tr. 25). Claimant has not past relevant work. Claimant is a "younger individual age 18-44" with a limited education and the ability to communicate in English. The ALJ found that the transferability of skills is not an issue, because Claimant does not have past relevant work. (Tr. 25). The ALJ found since attaining age 18, considering Claimant's age, education, work experience, and residual functional capacity, jobs exist in significant numbers in the national economy that Claimant is able to perform. (Tr. 26). The ALJ concluded that Claimant has not been under a disability since September 6, 2008, the day Claimant attained 18, through the date of the decision. (Tr. 26).

## V.     Discussion

In a disability insurance benefits case, the burden is on the claimant to prove that he or she has a disability. <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001). Under the Social Security Act, a disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). Additionally, the claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B); <u>see</u> <u>also</u> <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140 (1987).

The Commissioner has promulgated regulations outlining a five-step process to guide an

ALJ in determining whether an individual is disabled.  First, the ALJ must determine whether the individual is engaged in "substantial gainful activity."  If she is, then she is not eligible for disability benefits.  20 C.F.R. § 404. 1520(b).  If she is not, the ALJ must consider step two which asks whether the individual has a "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  If the claimant is not found to have a severe impairment, she is not eligible for disability benefits.  If the claimant is found to have a severe impairment the ALJ proceeds to step three in which he must determine whether the impairment meets or is equal to one determined by the Commissioner to be conclusively disabling.  If the impairment is specifically listed or is equal to a listed impairment, the claimant will be found disabled.  20 C.F.R. § 404.1520(d).  If the impairment is not listed or is not the equivalent of a listed impairment, the ALJ moves on to step four which asks whether the claimant is capable of doing past relevant work.  If the claimant can still perform past work, she is not disabled.  20 C.F.R. § 404.1520(e).  If the claimant cannot perform past work, the ALJ proceeds to step five in which the ALJ determines whether the claimant is capable of performing other work in the national economy.  In step five, the ALJ must consider the claimant's "age, education, and past work experience."  Only if a claimant is found incapable of performing other work in the national economy will she be found disabled.  20 C.F.R. § 404.1520(f); see also Bowen, 482 U.S. at 140-41 (explaining five-step process).

Court review of an ALJ's disability determination is narrow; the ALJ's findings will be affirmed if they are supported by "substantial evidence on the record as a whole."  Pearsall, 274 F.3d at 1217.  Substantial evidence has been defined as "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision."  Id.  The court's review

"is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision, we also take into account whatever in the record fairly detracts from that decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The Court will affirm the Commissioner's decision as long as there is substantial evidence in the record to support his findings, regardless of whether substantial evidence exists to support a different conclusion. Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).

In reviewing the Commissioner's decision, the Court must review the entire administrative record and consider:

1.      The credibility findings made by the ALJ.

2.      The claimant's vocational factors.

3.      The medical evidence from treating and consulting physicians.

4.      The claimant's subjective complaints relating to exertional and non-exertional activities and impairments.

5.      Any corroboration by third parties of the claimant's impairments.

6.      The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "if it is supported by substantial evidence on the record as a whole." Wiese v. Astrue, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion." Wiese, 552 F.3d at 730

(quoting Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004)).  When reviewing the

record to determine whether the Commissioner's decision is supported by substantial evidence,

however, the Court must consider evidence that supports the decision and evidence that fairly

detracts from that decision.  Id.  The Court may not reverse that decision merely because

substantial evidence would also support an opposite conclusion, Dunahoo v. Apfel, 241 F.3d

1033, 1037 (8th Cir. 2001), or it might have "come to a different conclusion." Wiese, 552 F.3d at

730.  Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those

positions represents the agency's findings, the [Court] must affirm the agency's decision."

Wheeler v. Apfel, 224 F.3d 891, 894-95 (8th Cir. 2000).  See also Owen v. Astrue, 551 F.3d 792,

798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's

decision falls within the available zone of choice") (internal quotations omitted).

Claimant argues that the ALJ's decision is not supported by substantial evidence on the

record as a whole, because the ALJ failed to develop the record as to the opinion of her treating

physician.  Next, Claimant contends that the ALJ erred in finding that she has the RFC for a full

range of light work.  Claimant further contends that the ALJ failed to elicit vocational expert

testimony and instead relied on the Guidelines.

A.      Weight Given to Treating Doctor

Claimant contends that the ALJ committed reversible error in his evaluation and rejection

of Dr. Onik's opinion.


As the ALJ acknowledged in his decision, Dr. Onik was Claimant's treating physician.  Dr.

Onik's treatment notes are brief and somewhat illegible, but the notes show Dr. Onik treated

Claimant approximately six times between September 2007 and July 2009 for asthma, peripheral neuropathy, RSD nerve disorder, and vertigo. (Tr. 171-76, 190-92, 226-29). In the to whom it may concern letter written by Dr. Onik, on June 1, 2009, Dr. Onik noted that he has treated Claimant for complaints of generalized motor and neurological pain. Dr. Onik opined "[d]ue to the extraordinary symptomatic pain that she demonstrates, it is my feeling that she is eligible for disability until this has been disproved." (Tr. 225). There are no treatment notes dated June 1, 2009 showing Dr. Onik examined Claimant or completed any testing on that day, and none of the earlier treatment records contain any objective evidence of limitation of the degree set forth in the letter.

"A treating physician's opinion is given controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record." Tilley v. Astrue, 580 F.3d 675, 679 (8th Cir. 2009) (quoting 20 C.F.R. §404.1527(d)(2) (alteration in original). "[W]hile a treating physician's opinion is generally entitled to substantial weight, such an opinion does not automatically control because the [ALJ] must evaluate the record as a whole." Wagner v. Astrue, 499 F.3d 842, 849 (8th Cir. 2007) (internal quotations omitted). Thus, "'an ALJ may grant less weight to a treating physician's opinion when that opinion conflicts with other substantial medical evidence contained within the record.'" Id. (quoting Prosch v. Apfel, 201 F.3d 1010, 1013-14 (8th Cir. 2000)).

Title 20 C.F.R. § 404.1527(d) list six factors to be evaluated when weighing opinions of treating physicians: (1) the examining relationship; (2) the treatment relationship, including the length of the relationship, the frequency of examination, and the nature and extent of the

relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other factors, e.g., "the extent to which an acceptable medical source is familiar with the other information in [the claimant's] case record." 20 C.F.R. § 404.1527(d)(1)-(6). Consideration of these factors supports the ALJ's decision not to give greater weight to the disability determination of Dr. Onik.

First, to the extent Dr. Onik opined that Claimant is disabled, a treating physician's opinion that a claimant is not able to work "involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight." Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005). The ALJ acknowledged that Dr. Onik was a treating source, but that his opinion was not entitled to controlling weight because it was not well-supported by medically acceptable clinical and laboratory techniques and is inconsistent with his prescribed medical treatment. See Travis v. Astrue, 477 F.3d 1037, 1041 (8th Cir. 2007) ("If the doctor's opinion is inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight."). Moreover, a brief conclusory letter from a treating physician stating that the applicant is disabled is not binding. Ward v. Heckler, 786 F.2d 844, 846 (8th Cir. 1986) ("Even statements made by a claimant's treating physician regarding the existence of a disability have been held to be properly discounted in favor of the contrary medical opinion of a consulting physician where the treating physician's statements were conclusory in nature."). As noted by the ALJ, Dr. Onik did not provide any specific limitations on physical activity but opined Claimant to be eligible for disability based upon the symptomatic pain and not based on any functional or other physical restrictions caused by her impairment.

The ALJ acknowledged that Dr. Onik was a treating source, but that his opinion was not entitled to controlling weight because it was not well-supported by medically acceptable clinical

and laboratory techniques. The undersigned notes no examination notes accompanied the letter. Opinions of treating doctors are not conclusive in determining disability status and must be supported by medically acceptable clinical or diagnostic data. Chamberlain v. Shalala, 47 F.3d 1489, 1494 (8th Cir. 1995); 20 C.F.R. § 404.1527(d)(3) (providing that more weight will be given to an opinion when a medical source presents relevant evidence, such as medical signs, in support of his or her opinion). As noted by the ALJ, Dr. Onik's opinion primarily relies upon Claimant's subjective reports of pain rather than objective evidence. Kirby v. Astrue, 500 F.3d 705, 709 (8th Cir. 2007) ("The ALJ was entitled to give less weight to Dr. Harry's opinion, because it was based largely on Kirby's subjective complaints rather than on objective medical evidence.").

Second, Dr. Onik's opinion is inconsistent with his treatment notes. Davidson v. Astrue, 578 F.3d 838, 842 (8th Cir. 2009) ("It is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes."). An ALJ may "discount or even disregard the opinion of a treating physician ... where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000); Hackler v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006) (holding that where a treating physician's notes are inconsistent with his or her RFC assessment, controlling weight is not given to the RFC assessment). Indeed, in his treatment notes Dr. Onik never set forth any specific limitations on physical activity.

Third, the ALJ considered that Dr. Onik's opinion was inconsistent with the conservative treatment which Claimant received. Conservative treatment is inconsistent with discrediting a claimant's allegation of disabling pain. Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998). The

objective medical record provides little diagnostic support for Claimant's alleged disabling pain. During examination, Dr. Connolly observed Claimant's gait to be normal and Claimant able to walk on her heels and her toes. Based on MRI studies of Claimant's brain and spine showed normal results, Dr. Connolly noted how extensive testing has proven to be non-diagnostic. During evaluation in October 2008, examination of Claimant's knees showed full range of motion from 0 to 130 degrees bilaterally, and Dr. Brophy opined that Claimant's episodes of knee pain do not appear to be caused by any structural abnormality. Indeed, Dr. Brophy indicated that Claimant could continue activities on an as-tolerated basis and should continue to work on strengthening of her knee musculature and recommended conservative treatment.

As noted by the ALJ, Claimant testified at the hearing that she is able to use the television and the computer, help her mother with small tasks, and assist in the care of her aunt. (Tr. 17-18, 35, 41-45). Likewise, at the hearing, the ALJ observed Claimant to sit for more than one hour with no apparent discomfort and enter and exit the hearing room without an antalgic gait. While an ALJ cannot accept or reject subjective complaints solely on the basis of personal observations, an ALJ's observations of a claimant's appearance and demeanor during the hearing is a consideration. Steed v. Astrue, 524 F.3d 872, 876 (8th Cir. 2008) (holding that an ALJ "is in the best position" to assess credibility because he is able to observe a claimant during his testimony); Johnson v. Apfel, 240 F.3d 1145, 1147-48 (8th Cir. 2001) ("The ALJ's personal observations of the claimant's demeanor during the hearing [are] completely proper in making credibility determinations). See Lamp v. Astrue, 531 F.3d 629, 632-33 (8th Cir. 2008) (holding that in assessing the plaintiff's allegations of lack of concentration, an impaired memory, and depression, the ALJ properly combined his review of the record with his personal observations); Flynn v.

<u>Astrue</u>, 513 F.3d 788, 794 (8th Cir. 2008) (same with respect to the ALJ's observation, in assessing the plaintiff's physical RFC, that the plaintiff was able to sit through the one-hour hearing).

For the foregoing reasons, the ALJ's decision is supported by substantial evidence on the record as a whole. Inasmuch as there is substantial evidence to support the ALJ's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court could have decided the case differently. <u>Gowell v. Apfel</u>, 242 F.3d 793, 796 (8th Cir. 2001). Accordingly, the decision of the ALJ denying Claimant's claims for benefits should be affirmed.

B.      <u>Residual Functional Capacity</u>

Claimant contends that the ALJ erred in finding that she has the RFC for a full range of light work.

The ALJ assessed Claimant's RFC as including the ability to perform the full range of light work as defined in 20 C.F.R. § 416.967(b) ("Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds ... [and] a good deal of walking or standing."). As noted above, Claimant has the burden at step four of establishing his RFC. <u>See</u> <u>Masterson v. Barnhart</u>, 363 F.3d 731, 737 (8th Cir. 2004). On the other hand, the ALJ has the responsibility of assessing the RFC based on all the relevant evidence, including "at least some supporting [medical] evidence from a professional." <u>Id.</u> at 738.

Determination of residual functional capacity is a medical question and at least "some medical evidence 'must support the determination of the claimant's [residual functional capacity] and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the

workplace.'" Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (quoting Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)). Further, determination of residual functional capacity is "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Similarly, in making a finding of residual functional capacity, an ALJ may consider non-medical evidence, although the residual functional capacity finding must be supported by some medical evidence. See Lauer, 245 F.3d at 704.

Here, the ALJ carefully considered the medical records submitted by Claimant in support of her claim of disability. In addition, the ALJ carefully considered the nonmedical evidence, including Claimant's daily activities and testimony and appearance at the hearing. Claimant testified the she could watch televison and use the computer, go shopping, help her mother with tasks, and assist in the care of her aunt. The ALJ observed Claimant able to sit for more than one hour during the hearing with no observable discomfort, and her gait not to be antalgic when entering or exiting the hearing room.

Based on Pfitzner v. Apfel, 169 F.3d 566 (8th Cir. 1999), Claimant suggests that the ALJ erred in describing her RFC in general terms. In support, Claimant contends that the ALJ found that she can perform a full range of light work without describing nonexertional limitations would affect her ability to perform light work. The ALJ did consider Claimant's credibility regarding the intensity, persistence, and limiting effects of her symptoms and concluded Claimant was not entirely credible. Further, upon finding Claimant could perform a full range of light work, the ALJ specifically considered the requirements of light work. See Goff v. Barnhart, 421 F.3d 785,

790 (8th Cir. 2005) (holding that it is an ALJ's role to assess a claimant's capacity to perform each of the exertional and nonexertional functions of a given level of work in order to decide which exertional level is appropriate and to decide whether the individual is capable of doing the full range of work contemplated by the exertional level).  As such, Claimant's reliance on Pfitzner is misplaced.

C.     Vocational Expert Testimony

Claimant further contends that the ALJ failed to elicit vocational expert testimony and instead relied on the Guidelines.

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, as in this case, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001); see also 20 C.F.R. § 404.1520(f).  The Commissioner may meet his burden by eliciting testimony by a vocational expert, Pearsall v. Massanari, 274 F.3d 1211, 1219 (8th Cir. 2001), or "[i]f [a claimant's] impairments are exertional (affecting the ability to perform physical labor), the Commissioner may carry this burden by referring to the medical-vocational guidelines or 'grids,' which are fact-based generalizations about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional impairment."  Holley v. Massanari, 253 F.3d 1088, 1093 (8th Cir. 2001); see also Foreman v. Callahan, 122 F.3d 24, 25 (8th Cir. 1997) (for exertional impairments, Secretary may carry burden by referring to the grids, which are fact-based generalizations about the availability of jobs for people of varying ages, educational backgrounds, and previous work experiences with differing degrees of exertional impairments).  "The

Medical-Vocational Guidelines are a set of rules that direct whether the claimant is or is not disabled '[w]here the findings of fact made with respect to a particular individual's vocational factors and [RFC] coincide with all of the criteria of a particular rule.'" King v. Astrue, 564 F.3d 978, 981 (8th Cir. 2009) (quoting 20 C.F.R. pt. 404, subpt. P, app. 2, § 200.00(a)). "If a mental impairment affects the claimant's ability to meet job demands other than strength, the Guidelines are not directly applied but 'provide a framework to guide [the] decision.'" Id. (quoting 20 C.F.R. § 404.1569(a)). Use of the Guidelines is appropriate if "a claimant's subjective complaints of pain are explicitly discredited for legally sufficient reasons articulated by the ALJ[.]'" Baker v. Barnhart, 457 F.3d 882, 894-95 (8th Cir. 2006) (quoting Naber v. Shalala, 22 F.3d 186, 189-90 (8th Cir. 1994)).

At step five, the burden of proof shifts to the Social Security Administration to show that there are other jobs existing in significant numbers in the national economy that the claimant can perform. The claimant's age, education, and vocationally past relevant work experience, if any, must be viewed in conjunction with the Medical-Vocational Guidelines of Appendix 2 of Subpart P of the Regulations, which contain a series of rules that may direct a conclusion of either "disabled" or "not disabled" depending upon the claimant's residual functional capacity and vocational profile. The Medical-Vocational Guidelines are used as a framework for the decision when the claimant cannot perform all of the exertional demands of work at a given level of exertion and/or has any significant nonexertional limitations. The ALJ opined "[s]ince attaining age 18, based on a residual functional capacity for the full range of light work, [and] considering the claimant's age, education, and work experience, a finding of "not disabled" is directed by Medical-Vocational Rule 202.17." (Tr. 26). Rule 202.17 is part of "Table No. 2- Residual

Functional Capacity: Maximum Sustained Work Capability Limited to Light Work as a Result of Severe Medically Determinable Impairment(s)," and it states that if a claimant is a younger individual (aged 18-49), with limited or less education ("[a]t least literate and able to communicate in English") who is unskilled or has no previous work experience, he or she is not disabled. 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 202.17. Applying this rule, the ALJ determined that Claimant was not disabled.

In the instant case, the ALJ used the Guidelines to direct a finding of not disabled finding that Claimant cannot perform her past relevant work and her vocational factors are the same as the corresponding criteria of Guideline Rule 202.17. Substantial evidence supports the ALJ's finding that Claimant's medical-vocational profile is accurately characterized by Grid Rule 202.17, and she does not suffer from a nonexertional impairment that significantly erodes the occupational base for light work.

The Guidelines can be used to determine disability, provided that the nonexertional impairments do not significantly diminish the claimant's residual functional capacity to perform the activities listed in them. Reed v. Sullivan, 988 F.2d 812, 816 (8th Cir. 1993). "However, when a claimant is limited by a nonexertional impairment, such as pain or mental incapacity, the Commissioner may not rely on the Guidelines and must instead present testimony from a vocational expert to support a determination of no disability." Holley, 253 F.3d at 1093; accord Baker v. Barnhart, 457 F.3d 882, 894-95 (8th Cir. 2006). See also Ellis v. Barnhart, 392 F.3d 988, 996 (8th Cir. 2005) (noting that the Guidelines may be employed if the nonexertional impairment does not diminish or significantly limit the claimant's RFC); Social Security Ruling 83-47C, 1983 W.L. 31276, *3 (S.S.A. 1983) ("[I]f the nonexertional limitation restricts a

claimant's performance of a full range of work at the appropriate [RFC] level, nonexertional

limitations must be taken into account and a nonguideline determination made.").

Substantial evidence supports the ALJ's determination that Claimant's nonexertional

limitations, her chronic pain syndrome, did not significantly limit her ability to perform the full

range of light work. As a result, the ALJ properly relied on the medical-vocational guidelines in

concluding that Claimant was not disabled. <u>Lucy v. Chater</u>, 113 F.3d 905, 908 (8th Cir. 1997);

<u>see</u> <u>also</u> <u>Kriebaum v. Astrue</u>, 280 F. App'x 555, 559 (8th Cir. 2008) (unpublished) finding that the

use of the guidelines was proper, because the medical record "failed to show any significant effect

of pain on [the claimant's] functional abilities). The ALJ did not err in relying on the Guidelines.

<u>See</u> <u>Thompson v. Bowen</u>, 850 F.2d 346, 349 (8th Cir. 1988) ("[I]f the ALJ determines that a

claimant's nonexertional limitations do not affect the claimant's [RFC] then the ALJ may rely on

the Guidelines to direct a conclusion of either disabled or not disabled without resorting to

vocational expert testimony.").

**IT IS HEREBY ORDERED, ADJUDGED and DECREED** that the final decision of

the Commissioner denying social security benefits be **AFFIRMED**.

Judgment shall be entered accordingly.

/s/ Terry I. Adelman
UNITED STATES MAGISTRATE JUDGE


Dated this  20th  day of March, 2012.